RECEIVED
IN ALEXANDRIA, LA.
JUN - 8 2009
TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| MELANIE LEAVELL, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILD PEYTON LEAVELL | : | DOCKET NO. 06-1760 |
| VS. | : | JUDGE TRIMBLE |
| UNITED STATES ARMY, ET AL | : | MAGISTRATE JUDGE KAY |

## OPINION AND JUDGMENT

*Introduction*

On December 30, 2008, this Court rendered judgment pursuant to Plaintiffs' motion for partial summary judgment finding that Defendant was liable to plaintiff, Melanie Leavell, for failing to timely diagnose a labial hematoma and further finding that Defendant was liable for the injuries sustained by Peyton Leavell. As to Mrs. Leavell's symphyseal separation, or pelvic separation, the Court concluded that there was a genuine issue of material fact as to whether or not Defendant was negligent in the performance of the vaginal delivery and the diagnosis and treatment of the symphyseal separation.[1] A complete recitation of the facts is stated in the Memorandum Ruling dated December 30, 2008.[2]

The parties were ordered to submit briefs concerning the number of medical malpractice caps that would be applicable in the lawsuit. On February 17, 2009, the Court ruled that two medical

---

[1] See docs. #44 and 45.

[2] Doc. #44.

malpractice caps are potentially applicable; one for the injuries suffered by Peyton Leavell, and a separate cap for the injuries suffered by Melanie Leavell.[3]

Pursuant to a conference between the parties and the Court, the parties agreed to have the remaining issue of liability as to Mrs. Leavell (the symphyseal separation) submitted to the Court on briefs. The briefs have been filed and the issue of liability is now before the Court for decision.

***Standard of law***

The United States, as sovereign, is immune from suit, except when it consents to be sued.[4] The Federal Tort Claims Act ("FTCA"),[5] is a limited waiver of sovereign immunity that allows for recovery from the United States for injury caused by the negligent or wrongful acts or omissions of an employee of the Government while acting within the scope of his office or employment.[6]

In a case brought pursuant to the FTCA, liability is determined ". . . in accordance with the law of the place where the act or omission occurred."[7] Thus, pursuant to the FTCA, liability in this matter is determined in accordance with Louisiana law.

Plaintiff alleges that her causes of actions arise under the Louisiana Medical Malpractice Act[8]

---

[3] Doc. #53.

[4] *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961 (1983).

[5] 28 U.S.C. § 2671, *et seq.*

[6] *United States v. Orleans,* 425 U.S. 807, 813, 96 S.Ct. 1971, 1975 (1976); *Laird v. Nelms,* 406 U.S. 797, 802-807, 92 S.Ct. 1899, (1972), *reh'g denied,* 409 U.S. 902, 93 S.Ct. 95 (1972); *Tindall by Tindall v. United States,* 901 F.2d 53 (5th Cir. 1990).

[7] 28 U.S.C. § 2674; *Hatahley v. United States,* 351 U.S. 173, 76 S.Ct. 745 (1956); *Tindall,* 901 F.2d at 54.

[8] La.R.S. 40:1299.42.

and the Louisiana Uniform Consent Law.[9]

Louisiana Revised Statute 9:2794 (a) provides that in a malpractice action based on the negligence of a physician, the plaintiff shall have the burden of proving:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the involved medical specialty.
>
> (2) That the defendant either lacked the degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.[10]

Mrs. Leavell also maintains that Defendant failed to obtain informed consent on multiple occasions; during pre-labor, at the time Mrs. Leavell presented herself at the hospital prior to delivery, and during stage II of her labor. Louisiana Revised Statute 40:1299.40(A)(1) provides that:

> [n]otwithstanding any other law to the contrary, written consent to medical treatment means the voluntary permission of a patient, through signature, marking, or affirmative action... to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is evidenced by a signature, marking, or affirmative action through electronic means, by the patient for whom the procedure is to be performed. . . .

---

[9] La.R.S. 40:1299.40.

[10] La.R.S. 9:2794(A).

3

12 La.Civ.L. Treatise, Torts Law § 15.6 further provides that:

[a] physician has a legal obligation to inform the patient as to the particular material risk associated with the proposed medical treatment at the time the consent is sought. It is the doctor's duty to inform the patient of the known material risks and the reasonable alternatives. The physician is not required to disclose risks that are not reasonably foreseeable or not material.

*Opinion*

Plaintiff, Melanie Leavell, maintains that she possessed exceptional risk factors which warranted that a caesarean section be performed. Those risk factors include uncontrolled diabetes, insulin dependent, fetal macrosomia, multiple prior births, male fetus, African American genetics, oxytocin augmentation, increasing size of prior infants, operative vaginal delivery, the last infant weighed 9 lbs, 11 ozs., and on September 9, 2003, three weeks prior to delivery, an ultrasound showed the infant's weight to be approximately 3384 grams.

Mrs. Leavell argues that Defendant failed to inform her of certain material risks, other than the symphyseal separation. Both experts agreed that a symphyseal separation occurs so rarely during a vaginal delivery that it would not have been one of the risks they would have informed Mrs. Leavell of. Also, during the delivery, Mrs. Leavell demonstrated multiple intrapartum risk factors which should have been met with a recommendation for a caesarean section. Mrs. Leavell argues that informed consent should have been obtained prior to the vaginal operative delivery being performed which included the use of traction and supra-pubic pressure, vacuum extraction, McRoberts maneuver, and the manual pushing by the attending nurse and Mrs. Leavell's husband. Furthermore, Mrs. Leavell asserts that failing to stop the delivery to perform a caesarean section after the complications experienced in the prolonged second stage of labor was a breach of the standard

of care.

Mrs. Leavell contends that Defendant breached the standard of care by applying extreme force during the vaginal delivery that should never have taken place. Mrs. Leavell maintains that the symphyseal separation was a damage flowing from these breaches of the standard of care.

Hence, Mrs. Leveall argues that but for the negligent physicians failing to get informed consent, and plaintiff not having undergone a caesarean section, she would not have suffered the symphyseal separation. She further argues that if she had had a planned caesarean section, of if she had been offered a caesarean section at presentation at the hospital, or after the delayed stage II of labor, no symphyseal separation would have occurred. Furthermore, if informed consent had been obtained for the child about the risk of shoulder dystocia and surgical vaginal delivery with manual traction, the symphyseal separation would not have occurred. And finally, had the use of excessive force not been applied, the injury would not have occurred.

Dr. Sinkhorn testified that Mrs. Leavell exhibited certain factors such as fetal macrosomia, maternal diabetes, and a prolonged second stage of labor, all of which are significant predictors of shoulder dystocia. Plaintiff makes this argument asserting that she was not fully informed that her child was at risk for this type of injury. Dr. Sinkhorn opined that a well-prepared, competent obstetrician would have conducted this labor with full realization that shoulder dystocia was a significant possibility, and Melanie Leavell should have been appropriately counseled with consideration of all of these factors. This counseling should have included the alternative cesarean section.

Dr. Sinkhorn further points out that had a sonogram at term been performed to estimate the fetal weight, it is medically probable that the sonogram would have shown that the infant's weight

was much greater than the 4500 grams (9 pounds, 14.73 ounces) originally estimated. The infant's actual birth weight was 5443 grams or 12 pounds.

Dr. Sinkhorn testified that "there was a 5.4 centimeter or approximately two-inch separation of the two pubic bones from each other."[11] He characterized the birth as a traumatic delivery "involving excessive force."[12] Dr. Sinkhorn testified that it was his medical opinion that there was a negligently forced vaginal delivery,[13] and that it was this excessive force during the delivery which caused the symphyseal separation.[14]

Dr. Sinkhorn further testified that "there was a lot of force used, and the force caused damage to the maternal pelvis, caused the separation of the pubic bones. . . ."[15] He further stated that there was ". . . very clear evidence of extreme force being used in this delivery, and with that evidence of extreme force being employed and with my knowledge that spontaneous symphyseal separation almost never occurs, its exceedingly rare. Essentially it's just looking at medical probability."[16]

Dr. Sinkhorn opined that Dr. Greer negligently forced a vaginal delivery to occur in Mrs. Leavell, who had multiple indications for cesarean section. He further opined that the "falls" below the standard of care in Mrs. Leavell's treatment caused her pubic symphyseal diastasis which, to a

---

[11] Plaintiff's exhibit C, p. 30-31.

[12] *Id.*, p. 44.

[13] Id., p. 48-49.

[14] *Id.*

[15] *Id.*, p. 31-32.

[16] *Id.*, p. 62.

degree of medical certainty, would not have occurred had she undergone a cesarean section."[17]

Dr. Gordon, defendant's expert, opined that he did not "think necessarily negligence caused [the symphyseal separation], I think this could have occurred with a simple uncomplicated vaginal delivery of a large baby."[18] Dr. Gordon concludes in his expert report that "these injuries did not occur due to negligence in the performance of the vaginal delivery" and that "no negligence occurred in the diagnosis or the treatment of the symphyseal separation."[19] Both experts (Dr. Sinkhorn and Dr. Gordon) testified that a symphyseal separation is such a rare occurrence that it would not have been one of the risks that Mrs. Leavell would have been informed of. Both experts agree that a symphyseal separation can result from the delivery of a large baby without any negligence occurring.[20]

However, the Court notes that had the sonogram been performed upon Mrs. Leavell's presentation at the Hospital, the size of the baby would have been determined, and a caesarean section would have more likely than not been performed. Dr. Sinkhorn testified that it was a "negligent choice" to "force a vaginal delivery to occur when a cesarean section was the proper choice"[21] and that "in the course of that vaginal delivery that. . . there was extreme force applied.

---

[17] Plaintiff's exhibit (not identified), p. 7 of exhibit 5 attached to Sinkhorn deposition dated April 17, 2009.

[18] Defendants' exhibit A, pp. 16, 19.

[19] Defendant's exhibit A, p. 19.

[20] Defendant's exhibit A, p. 16; Defendants' exhibit B. 58.

[21] Defendant's exhibit B, p. 61.

7

It was negligent to apply the extreme force."[22]

The Court finds that Defendant breached the standard of care during the treatment of Melanie Leavell upon presentation at the Hospital by failing to perform a cesarean section, by using excessive or extreme force in the vaginal delivery, and further failing to inform Mrs. Leavell of the risks associated with the operative vaginal delivery which included the use of traction and supra-pubic pressure, vacuum extraction, McRoberts maneuver, and the manual pushing by the attending nurse and Mrs. Leavell's husband. Accordingly,

**IT IS ORDERED, ADJUDGED AND DECREED** that judgment is rendered against Defendant, the United States Army, and in favor of Melanie Leavell in that Defendant is liable to Mrs. Leavell for the symphyseal separation injury. The matter is hereby referred to the Magistrate Judge for a scheduling conference to set a trial date to determine the damages of Peyton Leavell and Melanie Leavell.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 8th day of June, 2009.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

---

[22] *Id.*

8